IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| STEVEN B. FLINT, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>GARY DALE ARMONSTRONG, an individual; and KENNY PECORA, an individual,<br><br>        Defendants,<br><br>and<br><br>UNITED STATES MOUNTED SHOOTING, LLC,<br><br>        Nominal Defendant. | **ORDER GRANTING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br>Case No. 1:22-cv-00123-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Plaintiff Steven Flint sued Defendants Gary Armstrong and Kenny Pecora for allegedly breaching a purchase agreement.  Flint also included United States Mounted Shooting, LLC (USMS) as a Nominal Defendant for purposes of a declaratory judgment claim only.  Before the court is Armstrong, Pecora, and USMS's Motion to Dismiss for Lack of Personal Jurisdiction.[1] For the reasons explained below, the Motion is granted, and the court declines to use its discretion to exercise jurisdiction over the declaratory judgment claim against USMS.

---

[1] ECF 6.

## BACKGROUND[2]

Flint is a Utah resident, Armstrong is an Arkansas resident, and Pecora is a Missouri resident.[3]  USMS is a limited liability corporation organized in Arkansas.[4]  The citizenship of a limited liability company is determined by the citizenship of all its members.[5]  Armstrong and Pecora are the only members of USMS, so USMS is a citizen of Arkansas and Missouri.[6]

USMS is a mounted shooting organization that conducts all its business through Armstrong and Pecora.[7]  Armstrong operates USMS from his personal residence in Arkansas, and all USMS mail is sent to and from that residence.[8]  Individuals and clubs can affiliate with USMS and host their own mounted shooting competitions "using USMS's patterns and rules."[9]  USMS is affiliated with approximately 30 clubs across the country.[10]  When individuals sign up for a USMS membership, Armstrong and Pecora mail them a membership packet, including a membership card and information about USMS.[11]

---

[2] Because the court is reviewing a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(2), it draws the facts from the Complaint and the affidavits submitted by the parties.  *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008) ("A district court has discretion to resolve [a motion to dismiss for lack of personal jurisdiction] in a variety of ways—including by reference to the complaint and affidavits, a pre-trial evidentiary hearing, or sometimes at trial itself.").

[3] *Complaint* (ECF 15-7) ¶¶ 1–3.  Because the parties do not argue otherwise, the court assumes each individual is domiciled in—and thus a citizen of—the state he resides in.  *See State Farm Mut. Auto Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994) ("Residence alone is not the equivalent of citizenship, but the place of residence is *prima facie* the domicile.").

[4] ECF 15-7 ¶ 5.

[5] *See Grynberg v. Kinder Morgan Energy Partners, L.P.*, 805 F.3d 901, 905–06 (10th Cir. 2015).

[6] *See Flint Declaration* (ECF 15-2) ¶ 5; ECF 6 ¶ 6.

[7] ECF 6 ¶ 7; ECF 15-2 ¶ 4.

[8] ECF 15-2 ¶ 6.

[9] ECF 6 ¶ 7.

[10] *See USMS Clubs* (ECF 15-5).

[11] ECF 15-2 ¶ 7.

Flint is a member of USMS and has paid USMS membership fees.[12]  Until about June 2022, Flint was involved in USMS of Utah, a USMS affiliate.[13]  USMS of Utah "operates under the USMS name" and posts its competition results on the USMS website.[14]  USMS of Utah also pays USMS club membership fees and fees based on the number of individuals competing in a USMS of Utah competition.[15]  When Armstrong or Pecora know how many competitors there are in a USMS of Utah event, they send an invoice to USMS of Utah.[16]  USMS of Utah then sends a check to Armstrong's Arkansas residence.[17]

In 2021, Armstrong and a Utah business named Signature Press, Inc. agreed that Signature Press would be "USMS's authorized apparel provider."[18]  Signature Press created a website, "usmsapparel.com," that sells apparel and other items with USMS's name and logo.[19]  Signature Press is owned by Rick Johnson, a Utah resident who is also a member of USMS.[20]

Around November or December 2021, Flint, Johnson, and an individual they refer to as De Chapman began to negotiate with Armstrong and Pecora about purchasing ownership in USMS.[21]  Armstrong and Pecora had not advertised USMS as for sale, and Flint called them to discuss the potential purchase.[22]

---

[12] *Id.* ¶ 3.

[13] *Id.* ¶ 9.

[14] *Id.* ¶ 10.

[15] *Id.* ¶ 11.

[16] *Id.* ¶ 12.

[17] *Id.* ¶ 13.

[18] *Johnson Declaration* (ECF 15-3) ¶ 25.

[19] *Id.* ¶ 26.

[20] *Id.* ¶¶ 2–3, 23.

[21] ECF 15-2 ¶ 17; ECF 15-3 ¶ 27.

[22] *Armstrong Declaration* (ECF 6-1) ¶¶ 7–8; *Pecora Declaration* (ECF 6-2) ¶¶ 7–8.

3

After negotiations started, Flint and Armstrong "communicated directly . . . about the Purchase Agreement and other USMS business matters by email, text message, and phone multiples times per week."[23]  Flint "regularly communicated with Pecora by text message and over the phone while [Flint] was in Utah."[24]  Flint, Armstrong, and Pecora signed a Purchase Agreement dated January 17, 2022.[25]  They signed the Purchase Agreement in Arizona.[26]  Johnson and Chapman were not part of the agreement.[27]

In the Purchase Agreement, Flint agreed to purchase a 90% interest in USMS for $700,000.[28]  The parties also agreed Armstrong would retain 10% ownership of USMS and "remain as President of USMS for at least 5 years at an agreed salary of $62,000 per year."[29]  Similarly, the parties agreed Pecora would "be retained (as available) for his services at present rate of $500 per month."[30]  The Purchase Agreement also detailed how payment would proceed.  Flint would pay $150,000 at the time of closing, with "the balance of $550,000.00 to be paid by" December 31, 2022.[31]

"The Purchase Agreement was executed in February 2022."[32]  Before it was executed, Flint paid $25,000 toward the purchase price, $5,000 to purchase sound equipment, and $2,700

---

[23] ECF 15-2 ¶ 19.

[24] *Id.* ¶ 21.

[25] ECF 15-7 ¶ 9.

[26] ECF 6-1 ¶ 9; ECF 6-2 ¶ 9.

[27] ECF 15-2 ¶ 18; ECF 15-3 ¶ 28.

[28] ECF 15-7 ¶¶ 9–10; *see also* ECF 6-1 at 4 (Purchase Agreement).

[29] ECF 6-1 at 4.

[30] *Id.*

[31] *Id.*; ECF 15-7 ¶ 10.

[32] ECF 15-7 ¶ 11.

to purchase computers.[33]  On or about February 17, 2022, Flint wired an additional $125,000.[34] Flint sent these payments from his financial institution in Utah to an Arkansas bank account listing Armstrong as the "Beneficiary."[35]

At this point, Flint had paid Armstrong and Pecora $157,700, and he believed "closing" had occurred.[36]  He accordingly "requested copies of company records," but Armstrong "refused to cooperate," informing Flint he "had no ownership interest until the remainder of the purchase price was paid in full."[37]  Flint disagreed with Armstrong's assertion.[38]  But he decided he would "pay the remaining purchase price early in order to facilitate a swift and smooth ownership transition."[39]  On August 15, 2022, Flint's counsel told Armstrong and Pecora that Flint was prepared to make a $480,000 final payment and provide Armstrong with the 10% ownership interest.[40]  The correspondence from Flint's counsel included proof of funds and a Unit Grant Agreement memorializing Armstrong's 10% ownership interest.[41]

Armstrong responded by informing Flint that the 10% ownership interest—which had a $70,000 value—did not count towards the purchase price.[42]  According to Armstrong, this meant the final payment needed to be $550,000, not $480,000.[43]

---

[33] *Id.* ¶ 12.

[34] *Id.* ¶ 13.

[35] ECF 15-2 ¶¶ 26–27, Ex. D (Receipts).

[36] ECF 15-7 ¶¶ 14–15.

[37] *Id.* ¶¶ 15–16.

[38] *Id.* ¶ 17.

[39] *Id.*

[40] *Id.* ¶ 18.

[41] *Id.* ¶ 19.

[42] *Id.* ¶ 20.

[43] *Id.*

Armstrong, Flint, and Johnson had been planning a USMS event that would take place in Heber, Utah.[44]  They canceled that event because of the disagreement between Flint and Armstrong.[45]

## PROCEDURAL HISTORY

Flint filed his Complaint on August 19, 2022.[46]  He asserted four causes of action—two for declaratory judgment, one for breach of contract, and one for unjust enrichment.[47]  The breach of contract and unjust enrichment claims are alternative claims, asserted if the court does not grant declaratory relief.[48]  The first declaratory judgment claim is against Armstrong, Pecora, and USMS.[49]  Flint named USMS as a Nominal Defendant for purposes of this first declaratory judgment claim only.[50]  The remaining claims are against Armstrong and Pecora only.[51]

On September 28, 2022, Armstrong, Pecora, and USMS filed a Motion to Dismiss for Lack of Personal Jurisdiction under Federal Rule of Civil Procedure 12(b)(2).[52]  In support of the Motion, they included affidavits from Armstrong and Pecora.[53]  Flint filed an Opposition, including affidavits from Flint and Johnson.[54]  Armstrong, Pecora, and USMS filed a Reply to the Opposition.[55]

---

[44] ECF 15-2 ¶ 15.

[45] *Id.* ¶ 16.

[46] ECF 15-7 at 9.

[47] *Id.* at 5–8.

[48] *Id.* at 6–8.

[49] *Id.* at 5.

[50] *Id.* ¶ 5.

[51] *Id.* at 6–8.

[52] ECF 6.

[53] ECF 6-1; ECF 6-2.

[54] *Opposition* (ECF 15); ECF 15-2; ECF 15-3.

[55] *Reply* (ECF 20).

## LEGAL STANDARDS

Under Rule 12, a party may move for the court to dismiss a complaint for "lack of personal jurisdiction."[56]  As the plaintiff, Flint "bears the burden of establishing personal jurisdiction."[57]  But "when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing."[58] "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits."[59]  "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[60]

When a nonresident defendant in a diversity action disputes personal jurisdiction, the "plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment."[61] Utah's long-arm statute "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution."[62]  The Utah standard is thus the same as "the more general 'due process' standard for jurisdiction."[63]

---

[56] Fed. R. Civ. P. 12(b)(2).

[57] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

[58] *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984).

[59] *Id.*

[60] *Id.*

[61] *Far West Cap., Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995).

[62] Utah Code § 78B-3-201(3).

[63] *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

Accordingly, whether this court has personal jurisdiction over Armstrong and Pecora depends on whether there are "minimum contacts" between them and Utah.[64]  And even if there are sufficient minimum contacts, personal jurisdiction may not be asserted if doing so would "offend 'traditional notions of fair play and substantial justice.'"[65]

## ANALYSIS

The Supreme Court has differentiated between two types of personal jurisdiction: general and specific.[66]  Flint argues this court has both general and specific jurisdiction.[67]

The court will first explain why it understands the parties' arguments concerning personal jurisdiction to be about Armstrong and Pecora, and not USMS.  Next, it will address Flint's argument that this court has general jurisdiction over Armstrong and Pecora.  Because the court concludes it does not have general jurisdiction, it then considers Flint's arguments concerning specific jurisdiction.  It likewise concludes it does not have specific jurisdiction.  The court will then explain why it is appropriate to dismiss the declaratory judgment claim against USMS.

I.   **The parties' arguments are limited to whether this court has personal jurisdiction over Armstrong and Pecora.**

In the first line of their Motion to Dismiss, Armstrong, Pecora, and USMS (collectively, the Defendants) state they are moving to dismiss the Complaint for lack of personal jurisdiction.[68]  But in a footnote, the Defendants assert that because USMS is a Nominal Defendant, "no personal jurisdiction analysis is required for USMS."[69]  And in the Argument

---

[64] See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).

[65] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

[66] See *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

[67] ECF 15 at 10–14.

[68] ECF 6 at 1.

[69] *Id.* at 3 n.2.

portion of their Motion, it is unclear whether the arguments relate to USMS.[70]  This is because although they often use the general term "defendants," most of their arguments are specific to Armstrong and Pecora.

Flint's Opposition seems clearly limited to Armstrong and Pecora.  For example, his arguments about general and specific jurisdiction focus on Armstrong's and Pecora's contacts with Utah.[71]  And in his Conclusion, he states, "The evidence in this case demonstrates that Armstrong and Pecora are subject to the [c]ourt's jurisdiction."[72]  There is no similar statement about USMS.

Finally, the Reply seems limited to Armstrong and Pecora.  But in a footnote, the Defendants fault Flint for not asserting "that USMS is subject to the [c]ourt's jurisdiction."[73]  This contradicts the Defendants' earlier footnote from their Motion, stating "no personal jurisdiction analysis is required for USMS."[74]

Considering the arguments presented, the court concludes the Motion is limited to challenging the court's personal jurisdiction over Armstrong and Pecora and does not challenge the court's ability to exercise personal jurisdiction over USMS.  Accordingly, the personal jurisdiction analysis is limited to Armstrong and Pecora.

However, the analysis is not limited to contacts Armstrong and Pecora made in their individual capacities.  In their Reply, Armstrong and Pecora argue they were sued in their

---

[70] *See id.* at 4–9.

[71] *See* ECF 15 at 10–14.

[72] *Id.* at 14.

[73] ECF 20 at 2 n.1.

[74] ECF 6 at 3 n.2.

individual capacities so any contacts they made on USMS's behalf are irrelevant.[75]  Their

argument relies on *Ten Mile Industrial Park v. Western Plains Service Corp.*[76]

     In *Ten Mile*, the Tenth Circuit stated, "Where the acts of individual principals of a

corporation in the jurisdiction were carried out solely in the individuals' corporate or

representative capacity, the corporate structure will ordinarily insulate the individuals from the

court's jurisdiction."[77]  But that case involved a suit brought in the district of Wyoming.[78]  And

the Tenth Circuit has since clarified, "*Ten Mile*'s statements about the fiduciary shield must be

confined to the doctrine as applied in Wyoming."[79]  Accordingly, the personal jurisdiction

analysis is not limited to contacts Armstrong and Pecora made in their individual capacities.

## II.    Flint has not made a prima facie showing that this court has general jurisdiction over Armstrong and Pecora.

     Flint argues this court has general jurisdiction over Armstrong and Pecora.[80]  Even

assuming his well-pled facts are true, Flint has not made a prima facie showing of general

jurisdiction.

     For individuals, "the paradigm forum for the exercise of general jurisdiction is the

individual's domicile."[81]  Accordingly, courts may exercise general jurisdiction over defendants

whose affiliations with the forum state are so "continuous and systematic" they are "essentially

at home" in the state.[82]

---

[75] ECF 20 at 2–4.

[76] 810 F.2d 1518 (10th Cir. 1987).  *See* ECF 20 at 2–3.

[77] 810 F.2d at 1527.

[78] *See id.* at 1521.

[79] *Newsome v. Gallacher*, 722 F.3d 1257, 1278 (10th Cir. 2013).

[80] ECF 15 at 10–11.

[81] *Goodyear*, 564 U.S. at 924.

[82] *Id.* at 919; *see also Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1221 (10th Cir. 2021).

It is undisputed that Armstrong is a resident of Arkansas and Pecora is a resident of Missouri.[83]  So the question is whether Armstrong's and Pecora's contacts with Utah are so "continuous and systematic" they are "essentially at home" Utah.[84]  The court concludes they are not.

To support his argument, Flint relies on the following factual assertions:

- "[O]ver 100 of USMS's members live in Utah, and Armstrong and Pecora regularly both accept payments from these members and mail membership packets to Utah addresses."

- "Armstrong and Pecora are heavily involved with USMS of Utah's membership and events."

- "Pecora has personally emailed invoices to Johnson and other Utah residents for charges related to USMS of Utah events."

- "The invoices to USMS of Utah are sent from Armstrong's personal address to a Utah address."

- Armstrong "receives and executes USMS of Utah's checks that are physically mailed to his home."

- "USMS of Utah competition results are reported to Armstrong and Pecora, who then post the results on USMS's website."

- Armstrong planned to hold and attend a USMS event in Heber, Utah.

- Armstrong facilitated a partnership between USMS and a Utah business that developed a website to sell USMS-branded items.[85]

Although Armstrong and Pecora receive mail from and send mail to Utah residents, that is not enough to show that they are "essentially at home" in Utah.[86]  The same is true for the fact that Armstrong and Pecora receive competition results from USMS of Utah and post them on the

---

[83] *See* ECF 15-7 ¶¶ 2–3; ECF 6 ¶¶ 3–4; ECF 15 ¶ 4.

[84] *See Goodyear*, 564 U.S. at 919.

[85] ECF 15 at 11.

[86] *See Goodyear*, 564 U.S. at 919.

USMS website.  Similarly, Armstrong's efforts to plan a USMS event in Utah and facilitate a relationship with a Utah business are not sufficiently "continuous and systematic."[87]  And even considering all these contacts together, Flint still has not made a prima facie showing that Armstrong's and Pecora's "affiliations with [Utah] are so 'continuous and systematic' as to render them essentially at home in" Utah.[88]  Accordingly, this court does not have general jurisdiction over Armstrong and Pecora.

### III.   Flint has not made a prima facie showing that this court has specific jurisdiction over Armstrong and Pecora.

The test for specific jurisdiction includes two requirements.  First, the defendants must have "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[89]  Second, "the plaintiff's injuries must 'arise out of' [the] defendant's forum-related activities."[90]

Flint argues this court has specific jurisdiction based on Armstrong's and Pecora's "contacts specifically related to the Purchase Agreement."[91]  But Flint's argument also references some of Armstrong's and Pecora's other contacts with Utah—for example, they "accept payments" from USMS members in Utah.[92]

The court will first address which of Armstrong's and Pecora's contacts with Utah are relevant to the specific jurisdiction analysis.  As it will explain, the only relevant contacts are

---

[87] *See id.*

[88] *See id.*

[89] *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

[90] *Dudnikov*, 514 F.3d at 1071 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

[91] ECF 15 at 13.

[92] *Id.*

those Armstrong and Pecora created with Utah and those related to the Purchase Agreement.  It will then explain why Flint has not made a prima facie showing of purposeful availment.

### A.  The only relevant contacts are those Armstrong and Pecora created with Utah and those related to the Purchase Agreement.

Specific jurisdiction is proper only if the plaintiff's alleged injuries "arise out of or relate to" the defendant's activities in the forum state.[93]  Without that connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the [forum]."[94]

Although this prong of the analysis is often listed as the second requirement, courts do not always address it second.[95]  The court will address it first to narrow which contacts are relevant.  It will first explain that the relationship with Utah must arise out of contacts Armstrong and Pecora themselves created with Utah.  Next, it will explain that only Armstrong's and Pecora's contacts related to the Purchase Agreement are relevant to the specific jurisdiction analysis.

First, the relationship with Utah must arise out of contacts created by Armstrong and Pecora.  The specific jurisdiction analysis "focuses on the relationship among the defendant, the forum, and the litigation," and that "relationship must arise out of contacts that the defendant *himself* creates with the forum State."[96]  In *Walden v. Fiore*, for example, the defendant DEA agent seized cash from the plaintiffs at an airport in Atlanta, Georgia.[97]  The plaintiffs then flew to Nevada, where they filed suit against the agent in federal district court.[98]  The Supreme Court

---

[93] *Burger King*, 471 U.S. at 472.

[94] *Bristol-Meyers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017).

[95] *See Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 909 n.19 (10th Cir. 2017) ("Courts do not always address [the specific jurisdiction] requirements separately or in the same sequential order.").

[96] 571 U.S. 277, 284 (2014) (quotation simplified).

[97] *Id.* at 279–80.

[98] *Id.* at 280–81.

held the Nevada court lacked personal jurisdiction because even if the agent knew the plaintiffs were from Nevada and would suffer an injury there, that was insufficient to show the agent's actions connected him to Nevada.[99]   The Court further explained that the plaintiffs suffered an injury in Nevada "not because anything independently occurred there, but because Nevada is where [the plaintiffs] chose to be at a time when they desired to use the" seized funds.[100]

Like the court in *Walden*, this court focuses its analysis on the contacts Armstrong and Pecora created with Utah—not Armstrong's and Pecora's contacts with Flint or Flint's contacts with Utah.[101]   Accordingly, some of the facts Flint relies on are irrelevant.  For example, Flint emphasizes he sent money to Armstrong and Pecora from a financial institution in Utah.[102]   But that "unilateral activity" simply shows Flint's connection to Utah and his connection to Armstrong and Pecora.[103]   It does not show that Armstrong and Pecora created contacts with Utah.[104]

Second, only Armstrong's and Pecora's contacts related to the Purchase Agreement are relevant.  All four of Flint's claims are based on his dispute with Armstrong and Pecora concerning the terms of the Purchase Agreement.[105]   Specifically, Flint's declaratory judgment claims allege "[t]here is currently a dispute as to the parties' status, rights, and obligations under the Purchase Agreement."[106]   Flint's breach of contract claim alleges Armstrong and Pecora

---

[99] *Id.* at 289–91.

[100] *Id.* at 290.

[101] *See id.* at 291 ("And it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State.").

[102] *See* ECF 15 at 14.

[103] *See Walden*, 571 U.S. at 291.

[104] *See id.* at 284.

[105] *See* ECF 15-7 ¶¶ 22–49.

[106] *Id.* ¶¶ 24, 29.

"materially breached the Purchase Agreement."[107]  And Flint's unjust enrichment claim alleges Flint's payments—made in reliance on Armstrong and Pecora's "promise to transfer ownership of USMS"—unjustly enriched Armstrong and Pecora.[108]

Flint's Complaint makes clear this controversy centers on the Purchase Agreement.  Flint thus appropriately relies on Armstrong's and Pecora's contacts with Utah that are "specifically related to the Purchase Agreement."[109]

But Flint also references Armstrong's and Pecora's contacts unrelated to the Purchase Agreement—for example, he contends Armstrong and Pecora "have regular contact" with USMS members in Utah because they "accept payments from the Utah members, and they are heavily involved with USMS of Utah."[110]  Nevertheless, Flint does not argue his injuries arise out of or in any way relate to these contacts with Utah.  So while the court assumes it is true that Armstrong and Pecora regularly contact USMS members in Utah and receive payments from them, those contacts do not factor into its specific jurisdiction analysis.[111]

In sum, the only relevant contacts in this case are those Armstrong and Pecora created with Utah and those related to the Purchase Agreement.

---

[107] *Id.* ¶ 36.

[108] *Id.* ¶¶ 44–48.

[109] *See* ECF 15 at 13.

[110] *Id.*

[111] *See Soma Medical Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1298 (10th Cir. 1999) (choosing to "ignore" contacts "completely unrelated" to the claims at issue).

**B. Armstrong's and Pecora's contacts related to the Purchase Agreement do not show they purposefully availed themselves "of the benefits and protections" of Utah law.**

The Tenth Circuit has identified potential "frameworks for determining whether an out-of-state defendant's activities satisfy the purposeful [availment] requirement."[112] The frameworks are: "(1) continuing relationships with forum state residents ('continuing relationships'); (2) deliberate exploitation of the forum state market ('market exploitation'); and (3) harmful effects in the forum state ('harmful effects')."[113]

To support his specific jurisdiction argument, Flint relies on Armstrong's and Pecora's contacts related to the Purchase Agreement.[114] So Flint seems to be relying on the continuing-relationships framework.[115] Under the continuing-relationships framework, courts "evaluate (a) the parties' 'prior negotiations,' (b) their 'contemplated future consequences,' (c) 'the terms of their contract,' and (d) 'the parties' actual course of dealing.'"[116] The court will evaluate each factor in turn, and it concludes Armstrong and Pecora had insufficient contacts to show purposeful availment.

**1. Prior Negotiations**

Flint asserts he started negotiating with Armstrong and Pecora in November or December 2021.[117] Armstrong and Pecora, however, assert they did not negotiate with Flint until January 2022, the same month the parties signed the Purchase Agreement.[118] They also maintain they

---

[112] *Old Republic*, 877 F.3d at 905.

[113] *Id.*

[114] ECF 15 at 13–14.

[115] *See Old Republic*, 877 F.3d at 905 ("In cases involving contractual contacts between the defendant and forum state residents, the purposeful direction analysis often employs the [continuing-relationships] framework.").

[116] *Id.* at 910 (brackets omitted) (quoting *Burger King*, 471 U.S. at 479).

[117] ECF 15-2 ¶ 17.

[118] ECF 6-1 ¶ 7; ECF 6-2 ¶ 7.

had no "correspondence or relationship" with Flint before January 2022.[119]  Because the court

must resolve "all factual disputes" in the plaintiff's favor, it assumes Flint is correct and the

parties started negotiating in November or December 2021.[120]

Flint also asserts that "[a]fter the parties started negotiating in November or December

2021," he "communicated directly with Armstrong about the Purchase Agreement and other

USMS business matters by email, text message, and phone multiple times per week."[121]  He

likewise states he "regularly communicated with Pecora by text message and over the phone

while [Flint] was in Utah."[122]  In support of these assertions, Flint attached screenshots of text

messages between him and Armstrong and him and Pecora.[123]  These text messages start in

January 2022 and include messages about the Purchase Agreement and more general USMS

business.[124]  Accordingly, the court assumes that after the parties started negotiating, they

communicated directly about the Purchase Agreement.  In their affidavits, Armstrong and Pecora

assert that they did not advertise USMS as being for sale and that Flint reached out to them about

purchasing USMS.[125]  Flint does not challenge these assertions, and the court accepts them as

true.

The parties' negotiations show Armstrong and Pecora had relevant contacts with a Utah

resident.  But these contacts alone are not sufficient to show purposeful availment.  The

---

[119] ECF 6-1 ¶ 8; ECF 6-2 ¶ 8.

[120] *See Behagen*, 744 F.2d at 733.

[121] ECF 15-2 ¶ 19.

[122] *Id.* ¶ 21.

[123] ECF 15-2, Exs. B & C (Text Messages).

[124] *See id.* at 12, 95.

[125] ECF 6-1 ¶¶ 7–8; ECF 6-2 ¶¶ 7–8.

negotiations and communications occurred for, at most, about two and a half months.[126]  And "[i]t is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts."[127]  The same holds true for text messages and emails.

It is also important that Flint—not Armstrong or Pecora—solicited the negotiations.[128] "Purposeful availment requires actions by the [d]efendant which 'create a substantial connection with the forum state.'"[129]  "Thus, courts have been unwilling to allow states to assert personal jurisdiction over foreign defendants where the defendant's presence in the forum arose from the unilateral acts of someone other than the defendant."[130]  Here, Armstrong's and Pecora's presence in Utah "arose from the unilateral acts" of Flint—namely, his contacting Armstrong and Pecora to start negotiations.

In sum, while the parties' negotiations suggest some contacts, the negotiations were not lengthy and were instigated by Flint.

### 2.  Contemplated Future Consequences

The Purchase Agreement contemplates future consequences.  These consequences are: (1) Armstrong was "to retain 10% ownership" of USMS; (2) Armstrong was "to remain as President of USMS for at least 5 years at an agreed salary of $62,000 per year;" and (3) Pecora was "to be paid for his ownership and to be retained (as available) for his services."[131]

---

[126] ECF 15-2 ¶ 17.

[127] *Far West Cap.*, 46 F.3d at 1077.

[128] *See* ECF 6-1 ¶¶ 7–8; ECF 6-2 ¶¶ 7–8.

[129] *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1092 (10th Cir. 1998) (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 109 (1987)).

[130] *Id.*

[131] *See* ECF 6-1 at 4.

But as illustrated in *Burger King Corp. v. Rudzewicz*,[132] it is important that Flint reached out to start negotiating the sale.  In *Burger King*, the Supreme Court concluded Florida had specific jurisdiction over a nonresident defendant who "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida."[133]  As part of its analysis, the Court emphasized how the nonresident defendant "deliberately reached out beyond" his home state to negotiate with Burger King, a Florida corporation.[134]  Armstrong and Pecora, however, did not "deliberately reach[] out beyond" their home states.[135]  Furthermore, the Purchase Agreement contemplates a continuing relationship between Flint, Armstrong, Pecora, and USMS.  But to the extent it contemplates a continuing relationship between Armstrong and Pecora and Utah, it does so only indirectly.  This is because the Purchase Agreement's only connection to Utah is that Flint is a Utah resident.

For these reasons, this factor weighs in Flint's favor, but only slightly.

### 3.  Terms of the Contract

As explained, the Purchase Agreement contemplated continued interactions among the parties.  But beyond those terms, the Purchase Agreement does not indicate purposeful availment by Armstrong or Pecora.

*Burger King* again provides a useful contrast.  There, the franchise agreement between Burger King and the nonresident defendant provided the defendant would pay Burger King an initial franchise fee plus monthly royalties and additional fees.[136]  These payments would be

---

[132] 471 U.S. 462 (1985).

[133] *Id.* at 480.

[134] *Id.* at 479 (brackets omitted).

[135] *See id.*

[136] *Id.* at 465.

made to Burger King's headquarters in Florida.[137]  The defendant also agreed "to submit to the national organization's exacting regulation of virtually every conceivable aspect of their operations."[138]  Additionally, the agreement provided "that the franchise relationship" was established in Florida "and governed by Florida law."[139]

In comparison, the terms of the Purchase Agreement here had little to do with Utah.  The parties did not agree that the Purchase Agreement or their relationship would be governed by Utah law.  Nor did Armstrong and Pecora—the sellers—agree to send money to Utah.

The Purchase Agreement's connection to Utah is that the purchaser (Flint) is a Utah resident.  Without more connections to Utah, the terms of the Purchase Agreement do not demonstrate that Armstrong and Pecora deliberately reached out to a Utah resident.

### 4.  Actual Course of Dealing

As explained, the parties negotiated the Purchase Agreement for approximately two and half months.[140]  During that time, they "communicated directly" with one another about the Purchase Agreement.[141]  But Flint has not asserted that Armstrong and Pecora "specifically solicited the contract at issue in this case."[142]  Rather, Armstrong and Pecora have asserted that Flint solicited the Purchase Agreement.[143]  Flint has not disputed this.

---

[137] *Id.* at 466.

[138] *Id.* at 465.

[139] *Id.* at 465–66.

[140] ECF 15-2 ¶¶ 19, 21, 23.

[141] *Id.* ¶¶ 19–22, Exs. B & C.

[142] *See Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1277 n.3 (10th Cir. 2005).

[143] ECF 6-1 ¶¶ 7–8; ECF 6-2 ¶¶ 7–8.

Furthermore, Armstrong and Pecora both assert they signed the Purchase Agreement in Arizona.[144]  They also assert they have not traveled to Utah, do not own any real estate or property in Utah, and do not pay taxes to Utah.[145]

Nevertheless, Flint relies heavily on the fact he wired money to Armstrong and Pecora from a financial institution in Utah.[146]  But that is a unilateral activity that does not show Armstrong and Pecora created contacts with Utah.[147]  And although Flint cites a Utah Court of Appeals case, *Go Invest Wisely LLC v. Barnes*,[148] that he believes says otherwise, federal courts are not bound by state court interpretations of federal law, even when sitting in diversity.[149]

In short, the parties' course of dealing does not indicate Armstrong and Pecora purposefully availed themselves of "the benefits and protections of" Utah law.[150]

### 5.  Weighing the Factors

Flint "has shown some—but not enough—contacts to establish purposeful [availment] under the continuing relationships framework."[151]  Flint has shown, for example, that the parties negotiated for approximately two and half months and communicated directly about the Purchasing Agreement.  Additionally, the parties agreed Armstrong and Pecora would continue to be involved in USMS and Armstrong would retain 10% ownership of USMS.

---

[144] ECF 6-1 ¶ 9; ECF 6-2 ¶ 9.

[145] ECF 6-1 ¶¶ 10–11; ECF 6-2 ¶¶ 10–11.

[146] *See* ECF 15 at 13.

[147] *See Walden*, 571 U.S. at 291.

[148] 2016 UT App 184, 382 P.3d 623.

[149] *See Wilder v. Turner*, 490 F.3d 810, 814 (10th Cir. 2007).

[150] *Hanson*, 357 U.S. at 253.

[151] *See Old Republic*, 877 F.3d at 914.

But other facts weigh more heavily in favor of a conclusion that Armstrong and Pecora did not purposefully avail themselves of the benefits of Utah law. Those facts include: (1) Armstrong and Pecora did not advertise USMS as for sale; (2) Flint reached out to Armstrong and Pecora and solicited the Purchase Agreement; (3) the parties did not agree that their relationship or the Purchase Agreement would be governed by Utah law; (4) Armstrong and Pecora did not come to Utah to negotiate the Purchase Agreement; and (5) the parties signed the Purchase Agreement in Arizona.

Considering these facts, Flint has not made a prima facie showing that Armstrong and Pecora purposefully availed themselves of "the benefits and protections of" Utah law.[152] Flint has thus not made a prima facie showing that this court has specific jurisdiction over Armstrong and Pecora.

### C.  The court must dismiss the claims against Armstrong and Pecora.

Because Flint has not made a prima facie showing that this court has general or specific jurisdiction over Armstrong and Pecora, it is unnecessary to consider whether exercising jurisdiction would offend traditional notions of fair play and substantial justice. Accordingly, this court does not have personal jurisdiction over Armstrong and Pecora, and it must dismiss the claims against them.

### IV.   The court will not use its discretion to exercise jurisdiction over Flint's declaratory judgment claim against USMS.

Although the court must dismiss the claims against Armstrong and Pecora, Flint's first cause of action is for declaratory judgment against all Defendants—including USMS. The court declines to use its discretion to exercise jurisdiction over USMS.

---

[152] *See Hanson*, 357 U.S. at 253.

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[153]  As indicated by the "may," this creates "an opportunity, rather than a duty," to grant declaratory relief.[154]

The Tenth Circuit has identified five factors district courts should consider when deciding whether to hear a declaratory action.[155]  Those factors are:

1. "whether a declaratory action would settle the controversy";

2. "whether it would serve a useful purpose in clarifying the legal relations at issue";

3. "whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race to *res judicata*'";

4. "whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction"; and

5. "whether there is an alternative remedy which is better or more effective."[156]

The parties have not alleged there is a parallel proceeding or requested an alternative remedy, so factors one and two are the most relevant to this case.  They both weigh in favor of dismissal.

**Factor 1.**  Flint's declaratory judgment claim against USMS requests "an order and judgment declaring the purchase has closed, and [Flint] is currently a 90% equity holder of USMS."[157]  But the Complaint alleges a disagreement between him and Armstrong about the purchase price.[158]  And Flint also asks for a judgment declaring the amount due is $480,000—

---

153 28 U.S.C. § 2201(a).

154 *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).

155 *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979 (10th Cir. 1994).

156 *Id.* at 983 (quoting *Allstate Ins. Co. v. Green*, 825 F.2d 1061, 1063 (6th Cir. 1987).

157 ECF 15-7 ¶ 25.

158 *Id.* ¶¶ 18–20.

not $550,000 as Armstrong allegedly demanded.[159]  Granting declaratory judgment against USMS would not settle the controversy about the purchase price.

Factor 2.  For similar reasons, the second factor also weighs in favor of dismissal. Although granting declaratory relief would clarify some "legal relations," it would not clarify the amount Flint owes Armstrong and Pecora.[160]  The purchase price is central to the controversy, so it wouldn't be "useful" to grant a judgment that does not clarify the purchase price.[161]

Granting Flint's declaratory judgment claim against USMS would not be an efficient use of judicial resources because doing so would not settle the controversy or be useful to clarifying legal relations.  Accordingly, the court declines to use its discretion to exercise jurisdiction over Flint's declaratory judgment claim against USMS.

## CONCLUSION

For the reasons explained, the court GRANTS the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.[162]  The court also declines to use its discretion to grant declaratory relief.  The claims against Armstrong, Pecora, and USMS are DISMISSED without prejudice to re-file in another forum.  The Clerk of Court is directed to close the case.

SO ORDERED this 7th day of July 2023.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[159] *Id.* ¶¶ 20, 30.

[160] *See Mhoon*, 31 F.3d at 983.

[161] *See id.*

[162] ECF 6.

24